## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

---

BELL ATLANTIC MOBILE OF ROCHESTER L.P.
*Doing Business As Verizon Wireless*,

Plaintiff,

-vs-

TOWN OF IRONDEQUOIT, NEW YORK; THE
TOWN BOARD OF THE TOWN OF
IRONDEQUOIT, NEW YORK; and THE BUILDING
DEPARTMENT OF THE TOWN OF
IRONDEQUOIT, NEW YORK,

Defendants.

DECISION and ORDER

11-CV-6141-CJS-MWP

---

### APPEARANCES

For Plaintiff:

Laurie Styka Bloom, Esq.
Nixon Peabody LLP
40 Fountain Plaza Suite 500
Buffalo, NY 14202
(716) 853-8102

Robert W. Burgdorf, Esq.
Nixon Peabody LLP
1100 Clinton Square
Rochester, NY 14604
(585) 263-1333

Joshua S. Turner, Esq., *pro hac vice*
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

For Defendants:

Robert B. Koegel, Esq.
Remington, Gifford, Williams & Colicchio, LLP
183 East Main Street Suite 1400
Rochester, NY 14604
(585) 232-5225

**Siragusa, J.** Before the Court are Defendants' Motion for Summary Judgment, July 29, 2011, ECF No. 16, and Plaintiff's Motion for Summary Judgment, July 29, 2011, ECF No. 18. Both involve Plaintiff's application before the Town of Irondequoit for permission to install a cell phone tower in Irondequoit. For the reasons stated below, Plaintiff's motion is granted, and Defendants' motion is denied.

## BACKGROUND

Pursuant to Western District of New York Local Rule of Civil Procedure 56, both parties filed statements of fact and responses to one another's statements of fact. The Court must view the evidence in the light most favorable to the non-moving party, *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 466 (2d Cir. 1995), and will outline the facts below, identifying those facts the parties dispute.

### Verizon Wireless

Plaintiff Bell Atlantic Mobile L.P., doing business as Verizon Wireless ("Verizon"), provides commercial mobile services and personal wireless services in and around Irondequoit, New York. Verizon operates a combined cellular and PCS (Personal Communications Service) personal wireless service network providing third-generation (3G) voice and data services to over 89.7 million Americans across the nation. Verizon also operates a 700 MHz LTE fourth generation (4G) network in the Rochester, New York area, including the Town of Irondequoit. Verizon customers use its services at work, while traveling, and at home.

A critical and growing use of wireless services is for public safety purposes. Verizon operates and maintains a network of wireless communications facilities, each consisting of antennas and related equipment designed to send and receive radio signals. The Federal Communications Commission ("FCC") has licensed Verizon to provide wireless communi-

cations throughout the Rochester, New York area, including the Town of Irondequoit. More than 296,000 wireless 911 calls are placed from mobile phones nationally every day, which represents about 50% of all emergency services calls. Verizon claims that emergency service providers, such as the St. Paul Municipal Fire District in Irondequoit, site of the proposed cell tower, also need to improve their networks and coverage areas to adequately provide those essential services. The Town disputes that Verizon has submitted evidentiary proof of the "need" to improve the fire district's networks and coverage.

Verizon provides mobile services via a network composed of neighboring personal wireless service towers or other facilities that are sited based upon Radio Frequency ("RF") planning. Each facility can only cover a limited geographic area, the scope of which may be affected by topography, tree heights, existing structures, the frequency bands and other factors. Each facility's "cell" (or radius) of service must, from an RF perspective, be located sufficiently close to adjacent and nearby sites to hand off calls to the next facility to allow continuous wireless service as the mobile user travels from cell to cell. Thus, placement of cell sites is extremely location sensitive, as each site's coverage area must "interlock" with neighboring cells, yet not unduly overlap (which causes interference); nor be unduly distant (which causes service gaps or holes between cells). There is limited flexibility as to where a cell site can be located and provide effective service.

### Zoning Authority of the Town

Defendants Town of Irondequoit, Town Board of Irondequoit and Department of Planning and Zoning of the Town of Irondequoit have zoning authority under New York law and pursuant to the Town's Zoning Code. The Town's Zoning Code, at Article XXII, provides Town policies and procedures relative to, *inter alia*, the location of wireless telecom-

munications facilities, such as the Application at issue here. For zoning purposes, Verizon is a public utility.

**_The Hoover Road Gap_**

Verizon has a significant service gap for PCS spectrum in and around the central portion of the Town, including along Hoover Road, Titus Avenue, Cooper Road and the surrounding areas (the "Hoover Road Gap"). This gap is in a large commercial and residential area in the center of the Town comprising several hundred residences and businesses, as well as several schools, churches, and other institutions. The center of the gap is approximately in the location of Irondequoit High School.

In order to fill the Hoover Road Gap, Verizon RF engineers identified an approximately one-quarter mile radius "search area" for potential sites that could address the coverage problem. In evaluating potential sites for a wireless facility, Verizon considered many factors, including the most basic one, _i.e._, ensuring that the site will function effectively with other existing facilities in Verizon's network to satisfy network signal coverage requirements and thereby provide reliable and uninterrupted service to customers and other authorized users. In placing new wireless service facilities, the first preference is to place wireless equipment on an existing tower or structure of sufficient height (known as a "co-location"). There were and are no existing towers or structures of sufficient height or structural soundness for co-location in the search area. Thus, Verizon concluded that, as a first preference, it needed to construct a new, stand-alone structure. The Town disputes Verizon's conclusion, citing to alternative technologies, including a distributed antenna system ("DAS"), which the Town contends would not require the construction of one or more new tall cell towers.

Verizon states that the second preference from a zoning standpoint is to rebuild or extend an existing tower that is structurally deficient or too short to accommodate the new antennae. In this case, Verizon identified such a tower at the St. Paul Boulevard Fire District site at 433 Cooper Road ("the Fire District Site"). The Fire District Site has an existing 60 foot high open lattice work communications tower (plus antennae with its top at approximately 82 feet above ground level). While this tower was too short to serve Verizon Wireless' needs, removing the existing structure and replacing it with a taller monopole not only worked from a technical standpoint, but provided minimal aesthetic intrusion. The Town disputes Verizon's contention that the second preference is to rebuild an existing tower, and cites to its Town Code § 235-135(C), which the Town contends makes locating a cell tower in an industrial or commercial zoning district the second preference from a Zoning perspective. Further, the Town disputes Verizon's assertion that the proposed cell tower will be minimally aesthetically intrusive.

***Cooper Road Site***

Verizon identified locations within the search area where a wireless facility could be located. Of all the locations examined, the only site that meets Verizon's technical needs and is actually available for use is the Fire District Site. This conclusion was reached after analyzing the factors described above, the network coverage potential of the site candidates, and the willingness of the land owners of potential sites to enter into a lease with Verizon. The Town disputes this, and claims that Verizon has refused to consider a site identified by it as the Joshua Park site, owned by the Town and zoned as commercial.

According to Verizon, it selected the Cooper Road location since: it met the RF coverage objective with the lowest tower height compared to other potential sites; there is

already an existing telecommunications tower on the property that will be replaced; it is located on municipal property; it provides a co-location opportunity to emergency services providers, such as the Fire District and Monroe County and others; the site is already devoted to a utility/public safety use as a fire station with an existing tower (that will be replaced); and significant vegetation and trees provide an aesthetic buffer for most of the monopole from the residential areas. The Town also disputes this assertion, stating that Verizon prematurely ended its consideration of alternative sites and that the proposed location does not have significant vegetation and trees to provide an aesthetic barrier from the adjacent residential areas.

***Pre-Application Meeting with the Town***

On June 3, 2010, Verizon had a preliminary meeting with Town officials regarding the need for the Monopole, as well as the site selection and application process. The June 3, 2010, meeting was attended by Town officials, including Larry Heininger (Director of Development – Town of Irondequoit), Patrick Meredith (Town of Irondequoit Commissioner of Public Works), and Donna Martello, Planning Assistant, who met with Verizon's Kathy Pomponio (Verizon Wireless Manager Real Estate (Consultant)), Brett Morgan (Verizon Wireless Site Acquisition Consultant) and Jared Lusk, Esq. (Verizon Wireless' counsel from the law firm Nixon Peabody LLP).   At that meeting, the Fire District Site was specifically discussed as the proposed location for the new monopole, and Town officials were receptive to Verizon's proposal to erect a tower at that location.

***Alternative Sites Considered***

Verizon explored a number of sites in or near the Hoover Road search area. Included were seven sites at the Irondequoit High School, one site at the United Church of Christ on

Titus Avenue, and eight other sites. Verizon looked into every alternative suggested by the Town Board, the Town Board's consultant, and the public, and found that, other than the Fire District Site, none of the other fifteen potential locations was viable to address the Hoover Road Gap. The Town contends that Verizon did not give consideration to the proposed Joshua Park site, and further characterizes Verizon's decision that the other fifteen sites are not suitable as premature. Verizon did consider that several sites at the high school would have been suitable, but school officials declined to enter into a lease with Verizon. Verizon also ruled out placing a sixty foot steeple tower at the United Church of Christ, because that location would have required a second tower to the north to address the Hoover Road Gap. Verizon considered the Irondequoit Town Hall, but found that site was too far to the east to address the Hoover Road Gap. During public hearings on Verizon's application, the Pinegrove Community Center, also known as the Helmer Nature Center on Pinegrove Road, and the St. Paul Fire District Property on Washington Avenue, were suggested as a potential sites, but Verizon determined they were too far from the search area to solve the Hoover Road Gap. Town Board member Paul Marasco suggested the St. Paul Exempt Assoc. Firemen's Homes, Inc., on Thomas Avenue, but Verizon found it was too far removed to cover the Hoover Road Gap. Verizon also considered combining parcels owned by the Genrich family, but determined that even if all the parcels were combined, Verizon could not meet the setback requirements, and, in any event, the Genrich family advised Verizon it was not interested in permitting a tower on the property.

***Verizon's Application***

On or about June 18, 2010, Verizon submitted to the Irondequoit Town Board an application to build a 120-foot wireless telecommunications facility (a cell phone tower) at

the Fire District Site. On July 2, 2010, Verizon provided the Town Board propagation data in support of its application, which had been inadvertently omitted from the original application package.

The 120 foot monopole and equipment shelter, which Verizon proposed, would replace an existing open lattice work tower at the Fire District Site. The existing open lattice work tower, located on the roof of the Fire District building, has been in place since 1991, is 60 feet tall, and has antennae extending to 82 feet. Verizon proposes to place the new monopole and equipment shelter in a new location on the same property, and states that the new monopole will stand approximately 40 feet higher than the existing tower. Verizon explains that once the monopole is installed, the existing lattice work tower will be removed and its antennae placed on the new monopole. Verizon further maintains that the height of the new monopole is necessary to address the Hoover Road Gap and that the proper height is 120 feet.[1] Further, Verizon states that the Fire District needs to move its antennae to improve its emergency communications capabilities. The Town disputes both the height requirement and the need for the Fire District to move its antennae. Moreover, the Town argues that the proposed monopole "would look like a 'Junk Yard on a Stick.'" Def.s' Opposing Stmt. of Mat'l Facts ¶ 28, Sept. 8, 2011, ECF No. 20-1.

On October 1, 2010, Verizon entered into a lease with the Fire District, to build the monopole up to 120 feet in height at the Cooper Road location. The Fire District Site is in

---

[1]The Town makes reference to Verizon's use of the 120 foot figure in some of its statements and contends that the application is now amended to a 100 foot tower and that any attempt by Verizon to withdraw its amendment would be in retaliation for the Town's invocation of SEQRA, discussed below. Verizon contends that its letter informing the Town that the height of the tower could be reduced to 100 feet was not an amendment of its application and argues that the Town's inaction has exceeded the reasonable time allowed by the FCC's "shot clock," to be discussed in detail below.

the R-1 zoning district where cellular towers are permitted upon issuance of a Special Use Permit. The parties dispute whether the proposed monopole meets the requirements of several provisions of the Town Code.

Verizon adds that the proposed monopole will have the least practical adverse visual effect as required by the Town Code, but, the Town contends that numerous Town residents dispute that assertion. As planned, the monopole structure will be unmanned, and it will draw a minimal amount of traffic, consisting of one to three visits a month as needed for routine maintenance and inspection. Furthermore, no water or sewer services are required. In July, 2010, the Monroe County Public Safety Communications Department expressed that it was "very interested" in co-locating on the monopole to improve its own emergency services network, establishing yet another benefit of replacing the existing tower.

On July 26, 2010, the Planning Board for the Town of Irondequoit reviewed Verizon's application and made a positive referral to the Town Board. On July 27, 2010, the Town Board held a public hearing on Verizon's application.

On August 13, 2010, a radio frequency consultant hired by the Town Board prepared an initial letter report for the Board. On August 17, 2010, Verizon supplemented its application with additional information in response to questions from the Town Board.

On August 17, 2010, the Town Board continued the public hearing it started on July 27th. On September 16, 2010, the Town Board's radio frequency consultant submitted another letter report to the Board and submitted two additional letter reports on October 18, 2010. On September 21, 2010, the Town Board held a regularly-scheduled meeting, but adjourned the public hearing on Verizon's application at Verizon's request, and further

tabled it until the November 16, 2010, meeting, again at Verizon's request. Verizon requested the adjournments to meet a requirement by the Town to submit further information and to conduct a crane test.

On December 16, 2010, Verizon further supplemented its application with additional information, and agreed, in a letter sent to the Town Board, that, despite the loss in overall coverage, the height of the proposed tower could be reduced from 120 feet to 100 feet. On January 10, 2011, and February 9, 2011, Verizon again supplemented its application. The Town Board met on January 12 and February 15, 2011, to consider Verizon's application.

However, during its February 15, 2011, meeting, the Town Board designated itself as lead agency under the New York Environmental Quality Review Act, New York Conservation Law Article 8 ("SEQRA"), and issued[2] a positive declaration under SEQRA requiring Verizon to prepare a draft scope for the environmental impact statement the Town Board now required for their application.

On March 10, 2011, counsel for the Town of Irondequoit orally informed Verizon's counsel of an alternative site in Joshua Park for the proposed cell tower, and Verizon's counsel orally advised the Town's counsel that the Joshua Park site was technically inadequate. On March 18, 2011, Verizon filed this lawsuit.

## STANDARD OF LAW

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and

---

[2] The positive declaration, Resolution No. 2011-4, was issued by the Town Board at a regular meeting on February 15, 2011. Bergdorf Aff. Ex. 28, Jul. 29, 2011, ECF No. 18-26, at 51; *But see* Verizon Memorandum of Law in Support of Summary Judgment and Permanent Injunction, at 2, 10 & 17, Jul. 29, 2011, ECF No. 30 (dates the issuance as February 11, 2011).

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 Moore's Federal Practice, § 56.11[1][a] (Matthew Bender 3d ed.). That is, the burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *See Amaker v. Foley*, 274 F.3d 677 (2d Cir. 2001); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893 (3d Cir.1987) (*en banc*). Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Once that burden has been met, the burden then shifts to the non-moving party to demonstrate that, as to a material fact, a genuine issue exists. FED. R. CIV. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is "material" only if the fact has some affect on the outcome of the suit. *Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine issue exists as to a material fact, the court must view underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Moreover, the court must draw all reasonable inferences and resolve all ambiguities in favor

of the non-moving party. *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993); *Anderson*, 477 U.S. at 248-49; *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001); *International Raw Materials, Ltd. v. Stauffer Chemical Co.*, 898 F.2d 946 (3d Cir. 1990). However, a summary judgment motion will not be defeated on the basis of conjecture or surmise or merely upon a "metaphysical doubt" concerning the facts. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9 (2d Cir. 1986). Rather, evidentiary proof in admissible form is required. FED. R. CIV. P. 56(e). Furthermore, the party opposing summary judgment "may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City, Department of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

## DISCUSSION

In its complaint, Verizon raises two causes of action: (1) unreasonable delay and failure to act on Verizon's application in violation of 47 U.S.C. § 332(c)(7)(B)(ii) and the November 18, 2009, Order[3] of the Federal Communications Commission ("FCC") ("shot clock" Order); and (2) unlawful prohibition of the provision of wireless services in violation of 47 U.S.C. § 332(c)(7)(B)(II).

***Telecommunications Act of 1996***

Section 704 of the Telecommunications Act of 1996 ("TCA"), codified at 47 U.S.C.

---

[3] Declaratory Ruling, *In re: Petition for Declaratory Ruling to Clarify Provisions of Section 332(c)(7)(B) to Ensure Timely Siting Review and to Preempt Under Section 253 State and Local Ordinances that Classify All Wireless Siting Proposals as Requiring a Variance*, WT Docket No. 08-165 (Federal Communications Commission, Nov. 18, 2009).

§ 332, states in pertinent part as follows:

(c) Regulatory treatment of mobile services….

(7) Preservation of local zoning authority.

(A) General authority. Except as provided in this paragraph, nothing in this Act shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

(B) Limitations.

(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—

(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

(iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

(v) Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis. Any person

adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that is inconsistent with clause (iv) may petition the Commission for relief.

(C) Definitions. For purposes of this paragraph–

(i) the term "personal wireless services" means commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services;

(ii) the term "personal wireless service facilities" means facilities for the provision of personal wireless services; and

(iii) the term "unlicensed wireless service" means the offering of telecommunications services using duly authorized devices which do not require individual licenses, but does not mean the provision of direct-to-home satellite services (as defined in section 303(v) [47 USCS § 303(v)]).

47 U.S.C.S. § 332(c)(7) (2011).

### *"Shot Clock" Order Interpreting "Reasonable Period of Time"*

The statute requires Defendants to "act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request." 47 U.S.C. § 332(c)(7)(B)(ii). The term "reasonable period of time," is not defined in the statute. However, on November 18, 2009, the FCC, acting pursuant to its authority in 47 U.S.C. § 201(b), determined,

that a "reasonable period of time" is, presumptively, 90 days to process personal wireless service facility siting applications requesting collocations, and, also presumptively, 150 days to process all other applications. Accordingly, if State or local governments do not act upon applications within those timeframes, then a "failure to act" has occurred and personal wireless service providers may seek redress in a court of competent jurisdiction within 30 days, as provided in Section 332(c)(7)(B)(v). The State or local government, however, will have the opportunity to rebut the presumption of reasonableness.

FCC Order ¶ 32. In a footnote to this paragraph, the FCC wrote,

> We note that the operation of this presumption differs significantly from the Petitioner's alternative proposal that the Commission establish a presumption in favor of a court-ordered injunction granting the application. Under the approach we are adopting today, if a court finds that the State or local authority has failed to rebut the presumption that it failed to act within a reasonable time, the court would then review the record to determine the appropriate remedy. The State or local authority's exceeding a reasonable time for action would not, in and of itself, entitle the siting applicant to an injunction granting the application.

*Id.* n.99.

Defendants argue that the FCC overstepped its authority in issuing the "shot clock" Order, and that the Order is being challenged in an action in the Fifth Circuit. *See City of Arlington, Texas v. FCC*, No. 10-60039 (5th Cir. Jan 21, 2010). On January 23, 2012, while the Court was drafting this Decision and Order, the Fifth Circuit issued a decision affirming the FCC's "shot clock" order.[4] The Fifth Circuit cautioned that the presumption only required the party against whom it is asserted (in this case, the Town defendants), to "burst the bubble" by producing evidence to rebut it, whereas the burden of persuasion remains with the party who benefits from the presumption (here Verizon). Slip. Opn. at 42–43. Relevant here, too, is the Fifth Circuit's recognition that,

> a state or local government that confronted an incomplete application, but delayed alerting the applicant to the deficiencies in the application, should be presumed to have acted unreasonably if the government ultimately did not act on the application within the time frames [of the shot clock order].

---

[4] Even before the Fifth Circuit issued its decision, this Court was disinclined to disregard the FCC's Order until a challenge proves successful. As the FCC pointed out, it did not exceed its authority since it was issuing an Order to clarify a phrase in the statute, and not imposing a new limitation. *See* Order ¶ 25 & n.74; H.R. Conf. Rep. No. 104-458, 104th Congress, 2nd Sess. 208 (1996). Furthermore, review of an FCC order must, by statute, be performed by the Circuit Court, not in district court. *See* 28 U.S.C. § 2342(1) (granting the court of appeals exclusive jurisdiction to "enjoin, set aside, suspend (in whole or in part), or to determine the validity of—(1) all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47….").

Slip. Opn. at 44.

Verizon filed its application on June 18, 2010, and completed it on July 2, 2010, with the filing of supplemental papers inadvertently left out of the June application. Applying the FCC's presumption, Defendants had until November 29, 2010, to act. Verizon and Defendants voluntarily agreed to an extension of the deadline until February 18, 2011. On February 15, 2011, the Town issued a Positive Declaration under SEQRA.[5]

***Application of SEQRA***

The State Environmental Quality Review Act, codified in New York Environmental Law Article 8, section 8-0101, *et seq.*, requires that, "[a]s early as possible in the formulation of a proposal for an action, the responsible agency shall make an initial determination whether an environmental impact statement need be prepared for the action." N.Y. Envtl. Conserv. Law § 8-0109(4) (McKinney 2011). SEQRA applies to any any action proposed or approved, "which may have a significant effect on the environment." *Id*. § 8-0109(1).

Verizon argues that the Town's Positive Declaration, triggering SEQRA, "was plainly pretextual and wholly unjustified under SEQRA." Pl.'s Reply Mem. of Law at 7, Oct. 7, 2011, ECF No. 24. The Court agrees. In that regard, the evidentiary proof does not support Defendants' contention that selection of the Fire District site will have a cumulative impact on the selection of future sites. "It was not necessary for the Planning Board to consider the cumulative impact that development of other rezoned properties would have on the

---

[5]In its memo of law, at 2, 10 & 17, ECF No. 30, Verizon states the date is February 11, 2011. In the Complaint, however, the date of the issuance of the positive declaration is listed as February 11, 2011 in two places, Compl. ¶¶ 2, 8, and as February 15, 2011, in one place, Compl. ¶¶ 115. The actual positive declaration itself appears to have been issued at a regular Town Board meeting on February 15, 2011, and filed by the Town Clerk on February 18, 2011. *See* Resolution No. 2011-4, Bergdorf Aff. Ex. 28, Jul. 29, 2011, ECF No. 18-26, at 51.

environment, particularly with respect to the water supply, inasmuch as there were no other proposed or pending developments of multifamily residences before it…." *Schweichler v. Village of Caledonia*, 45 A.D.3d 1281, 1283 (N.Y. App. Div. 4th Dep't 2007). As for alternate sites, more than a dozen were considered, and found inadequate. Although even during oral argument and as late as December 21, 2011,[6] Defendants were willing to compromise on the high school site, nothing before the Court indicates that the school district is willing to allow erection of a tower on its property. Further, the photographs included in Verizon's materials show that the impact of the monopole is not significantly greater than the current lattice tower now in place at the Fire District Site.

No questions were raised about any safety impacts of the monopole, and Verizon has agreed to create a safety breakpoint[7] in the tower if the Town so desires. The location of the proposed monopole, should it fail, would have the greatest impact on the fire station property, and Verizon represents that the proposed location meets the Town's clear zone requirements, or, at worst, would need a setback variance, which would not trigger SEQRA. N.Y. Compl. Codes R. & Regs. tit 6 § 617.5(c)(12) (1996). As Verizon points out, and as quoted above, the statute prohibits regulation of wireless "on the basis of the environmental effects of radio frequency emissions…." Thus, Defendants' concern about the perception

---

[6] Defense counsel informed the Court by letter, in response to the Court's request that the parties explore settlement, that the high school property might be a feasible compromise. However, Verizon's counsel informed the Court in a subsequent letter that the Town had not given them a settlement proposal and that he did not believe there was any framework in place for a resolution. Those letters arrived in late December 2011 and the Court has heard nothing further with regard to settlement.

[7] The Town asked if a "breakpoint" could be built into the monopole, and Verizon responded that it could, but that in any event, the monopole's proposed location "is such that it has a radius equal to its height on the parent parcel." Bergdorf Aff. Ex. 9, part 1, at 2, Jul. 29, 2011, ECF No. 18-21 (Verizon's application to the Town dated Feb. 9, 2011); *see also id.* Ex. KK (Sabre Towers & Poles letter to Town of Irondequoit, dated Jan. 19, 2011, stating that the monopole would be designed with a 25% safety factor above design wind speed).

that radio frequency transmissions from the tower are harmful, cannot be properly considered. Furthermore, speculative environmental loss, such as concern for property values, is also not an environmental factor under SEQRA, *see* SEQRA Handbook, Ch. 5, at 118 (answer to question 9) ("Purely economic arguments have been disallowed by the courts as a basis for agency conclusions when concluding a SEQR review by developing Findings. Therefore, potential effects that a proposed project may have in drawing customers and profits away from established enterprises, possible reduction of property values in a community, or potential economic disadvantage caused by competition or speculative economic loss, are not environmental factors"), and in any event, was disproved by Verizon. The SEQRA Handbook also contains this question and answer concerning an issue raised by Defendants:

> 18. If the "public controversy" box is checked yes, must the action be determined to be significant?
>
> No. Public controversy itself does not indicate significance but if there is substantial controversy over a potential impact the lead agency should give close attention to assessing that impact.

SEQRA Handbook, Ch. 4 at 76 (answer to question 18). Here, the record does not establish substantial controversy over a potential impact, but merely public controversy. Consequently, the Court concludes that Defendants' invocation of SEQRA was not required, and was done merely to delay the permitting process in contravention of the Federal statute and the FCC Order. Instructive is the case of *Lucas v. Planning Bd. of Town of LaGrange*, 7 F. Supp. 2d 310 (S.D.N.Y. 1998). There, the district court denied relief to a resident who sued his local town planning board when that body compromised with a wireless carrier and allowed a tower to be constructed near his property. The district court discussed one of the

purposes of the Telecommunications Act and specifically the provisions quoted above, writing that,

> these provisions implement Congress' intent "to stop local authorities from keeping wireless providers tied up in the hearing process" through invocation of state procedures, moratoria or gimmicks. *Sprint Spectrum L.P.*, 982 F. Supp. at 50 (quoting *Westel-Milwaukee Co. v. Walworth County Park and Planning Comm'n.*, 205 Wis.2d 244, 556 N.W.2d 107 (App.1996)).
>
> Tying up BAM and Cell-One in the "hearing process" is precisely what plaintiffs' invocation of SEQRA's procedures seeks to achieve in this case.

*Lucas*, 7 F. Supp. 2d at 321–22. Defendants and Verizon have carefully considered the placement of the proposed monopole and, from the evidence before it, the Court concludes that Defendants' invocation of SEQRA's procedures was merely a delaying tactic as a result of a vocal opposition to the placement of a monopole in the one location that would address the lack of coverage. Defendants' decision to delay final ruling on the application beyond the "shot clock" Order period has the effect of prohibiting the provision of personal wireless services in the Hoover Road Gap.

In support of its position that the Town's invocation of SEQRA was pretextual, Verizon relies on the Court of Appeals decision in *Matter of WEOK Broadcasting Corp. V. Planning Bd. of Town of Lloyd*, 79 N.Y.2d 373 (1992). There, the planning board denied a permit to build a cell tower based upon a concern that the tower would have an impact on the view from the historic home of Franklin D. Roosevelt and the Mid-Hudson bridge. The Court of Appeals upheld the decisions of the lower courts which annulled the planning board's determination. The trial court found, "nothing in the record other than generalized complaints voiced at the public hearings ... contradicted [the report of the Town's consultant] or WEOK's visual study." *Id*. at 379. The Court of Appeals, while recognizing the importance

of public comment on a proposed site plan, determined that, "generalized community objections such as those offered here in response to the comprehensive data provided by petitioner, cannot, alone, constitute substantial evidence, especially in circumstances where there was ample opportunity for respondent to have produced reliable, contrary evidence…." *Id*. at 385.

Verizon also relies on *Omnipoint Communications, Inc. v. Village of Tarrytown Planning Bd.*, 302 F. Supp. 2d 205 (S.D.N.Y. 2004), in which the district court wrote:

> In reviewing a local zoning board denial of a wireless facility application, the court "must overturn the board's decision under the substantial evidence test if it cannot conscientiously find that the evidence supporting the decision is substantial, when viewed in the light the record in its entirety furnishes, including the body of evidence opposed to the Board's view." *City of White Plains*, 175 F. Supp. 2d at 711. Where the review of the record demonstrates that the denial was not based upon substantial evidence, the court will not hesitate to direct the issuance of all necessary permits. *See Omnipoint Communications, Inc. v. Common Council of the City of Peekskill*, 202 F. Supp. 2d 210, 227 (S.D.N.Y. 2002) (finding that appropriate remedy for violation of the TCA is "immediate injunctive relief directing the issuance of a special permit, building permit and any other applicable permits or approvals necessary for Omnipoint to construct and operate its personal wireless service facility").
>
> The "substantial evidence" standard has been described as "less than a preponderance, but more than a scintilla of evidence. 'It means such relevant evidence as a reasonable mind might accept to support a conclusion.'" *Id*. at 221 (quoting *Universal Camera v. NLRB*, 340 U.S. 474, 477 (1951)). The unsubstantiated concerns of the general public do not constitute substantial evidence. *See id*. at 223.

*Omnipoint Communications, Inc.*, 302 F. Supp. 2d at 215–16.

After reviewing the evidence presented on these motions, the Court determines that no material issue of fact precludes summary judgment and that the Town's implication of SEQRA was pretextual and unsupported by substantial evidence. Accordingly, the Court grants Verizon's motion and will order appropriate relief, below.

*Injunction*

As a remedy, Verizon seeks a permanent mandatory injunction. The requirements for a permanent mandatory injunction are: (1) irreparable harm; and (2) success on the merits. *University of Texas v. Camenisch*, 451 U.S. 390, 392 (1981); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70,72 (2d Cir.1979). Courts have consistently held that a mandatory injunction is an appropriate remedy for violations of the TCA. *Cellular Telephone Company v. The Town of Oyster Bay*, 166 F.3d 490, 496 (2d Cir.1999) (finding that the TCA does not specify a remedy for violations and that a majority of district courts have held that the appropriate remedy is injunctive relief in the form of an order to issue the relative permits); *see also Preferred Sites, LLC v. Troup County*, 296 F.3d 1210, 1222 (11th Cir. 2002) (injunction ordering issuance of a permit is an appropriate remedy for a violation of the TCA.); *Nat'l Tower, LLC v. Plainville Zoning Board of Appeals*, 297 F.3d 14, 21-22 (1st Cir. 2002) (in the majority of cases the proper remedy for a zoning board decision that violates the TCA will be an order instructing the board to authorize construction.); *Omnipoint Communications, Inc. v. Planning & Zoning Commission of the Town of Wallingford*, 83 F. Supp. 2d 306, 312 (D. Conn. 2000) (finding that remand to board would not be appropriate as that would create further delay especially in light of the multiple hearings that have already spanned many months during the process).

Verizon has, on more than one occasion, attended a public hearing on its application for a wireless communications facility. Defendants are well aware of their responsibilities and obligations under the TCA and New York State law, yet they have willfully disregarded the law and wrongfully delayed action on Verizon's application. In this case, further review by Defendants would serve no useful purpose and would greatly prejudice Verizon by

encouraging additional delay in its ability to provide service to the public in a non-covered area. A mandatory injunction is therefore an appropriate remedy.

### CONCLUSION

In light of the above, the Court denies Defendant's motion for summary judgment, ECF No. 16, and grants Verizon's application for summary judgment, ECF No. 18, on all the causes of action in its complaint. Further, the Town of Irondequoit, New York; the Town Board of the Town of Irondequoit, New York; and the Building Department of the Town of Irondequoit, New York, are hereby ordered to approve Verizon's application for a special permit to allow construction of the proposed 120-foot monopole to address the Hoover Road Gap.[8] The Court will retain jurisdiction to enforce the injunction.

IT IS SO ORDERED.

Dated:   January 31, 2012
         Rochester, New York

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge

---

[8]Although, as indicated previously in footnote 1, the Town maintains that Verizon amended its application to propose installing a 100-foot tower, instead of the original 120-foot tower, the Court disagrees. In support of its contention, the Town relies Verizon's Hoover Rd Site RF Analysis # 2, dated Nov. 4, 2010, Bergdorf Aff. Ex. Z, Jul. 29, 2011, ECF No. 18-16. In pertinent part, the report states, "After much review and careful analysis of the transmitter test data, the 116' antenna centerline is appropriate for the Hoover Cell, as is preferred by Verizon Wireless. Nevertheless, although at the marginal end of acceptable antenna height, the Verizon Wireless RF engineering team concluded that a lower antenna centerline of 96' is acceptable for the Hoover Rd Cell." The Court concludes that the fact that a smaller structure would be marginally acceptable does not equate to the amendment the Town suggests.